**Opinion issued April 14, 2020**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-18-00281-CR**

———————————

**LAUREN OLSEN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 16th District Court**
**Denton County, Texas**
**Trial Court Case No. F17-2202-16**

---

**DISSENTING OPINION**

Lauren Olsen contends that she was entitled to a jury instruction under article 38.23 of the Code of Criminal Procedure because the evidence raised disputed fact issues as to the lawfulness of her arrest for driving while intoxicated with a child passenger. *See* TEX. PENAL CODE § 49.045(a). She argues that the jury should have

been instructed that if it resolved these disputed fact issues in her favor, it was then required to disregard the laboratory results of her post-arrest blood draw because this evidence was illegally obtained. The majority rejects Olsen's position, holding that Olsen did not introduce evidence controverting several factors on which the arresting officer relied in deciding that he had probable cause to arrest her for driving while intoxicated. In particular, the majority concludes that Olsen failed to present any evidence contradicting the arresting officer's testimony that she exhibited signs of intoxication during the field sobriety tests. Because the arresting officer's own testimony creates a disputed fact issue as to Olsen's performance on these tests and the arresting officer also testified that this was the sole basis for probable cause, I respectfully dissent.

### *Background*

The arresting officer, C. Brown, testified about the circumstances of Olsen's arrest. While on patrol one evening, Officer Brown came upon a disabled sedan. The sedan was still running when Brown stopped to render aid. Brown testified that the sedan's hazard lights were not turned on, but he conceded that his report said otherwise.

Brown approached the driver's side window and got the driver's attention. The driver—Olsen—was on her cell phone when he approached. Once Brown had gotten Olsen's attention, she got out of the sedan.

Olsen told Brown that she was driving home to Sherman after attending a barbeque at a friend's home in Lewisville. Based on the sedan's location, Brown noted that Olsen had been traveling in the wrong direction.

Both tires on the driver's side of the sedan were flat. There were holes in the tires, and they bore a white circular marking consistent with "curb marks," which are made when tires in motion rub against a curb.

Brown initially testified that Olsen told him that she thought someone had slashed her tires. But Brown later conceded that his dashcam video showed that Olsen had said she had a blowout and that it was Brown who had said that it looked as though her tires had been slashed.

By the time a tow truck arrived to tow away Olsen's sedan, Brown had decided to investigate the possibility that Olsen was intoxicated. He testified that several circumstances made him suspicious:

- Olsen was traveling in the wrong direction to reach her stated destination;

- Olsen was inconsistent as to the identity of the person with whom she was speaking on her cell phone; and

- the curb marks on the sedan's tires.

Brown conceded, however, that he did not think the condition of the tires was itself evidence of intoxication. He also testified that he did not know with whom Olsen had been speaking on her cell phone and that Olsen had merely told him that she was speaking with one of the children's grandparents without specifying which

3

particular grandparent. Given his limited knowledge and understanding of the cell phone conversation, Brown conceded that Olsen's apparent inconsistency as to the identity of the person with whom she was speaking was not necessarily evidence of intoxication.

Brown asked Olsen if she had been drinking. She told him that she had not. Brown later learned that Olsen's representation was untruthful, but he only learned that she had been untruthful at a family-court hearing held a few months after he arrested her. At that hearing, Olsen admitted that she had drunk three beers while at the barbeque.

According to Brown, Olsen did not show any signs of intoxication when she got out of the sedan or while they examined its tires. Nor did Brown notice an odor of alcohol on Olsen until after he had concluded his investigation. Brown testified that he smelled a faint odor of alcohol on Olsen once he had put her in his patrol car after her arrest. But he agreed that he did not record this in his report. His report states the opposite—that Olsen did not have an odor of alcohol.

Brown administered three standardized sobriety tests: the horizontal-gaze-nystagmus test, the walk-and-turn test, and the one-leg-stand test. He concluded that all three tests indicated that Olsen was intoxicated. At one point during his testimony, Brown agreed that when he arrested Olsen, he had no reason to think that she had been drinking other than her performance on the field sobriety tests.

4

But Brown's testimony about the field sobriety tests was inconsistent. He agreed that Olsen's attention may have been divided during the tests, as her ex-husband's mother, with whom she had a hostile relationship, had arrived on the scene and began recording Olsen. Brown also conceded during cross-examination that Olsen's physical faculties were good or at least normal during the field sobriety tests. As to her mental faculties, he identified a single deficiency—namely, that she did not follow instructions. But Brown acknowledged that her failure to do so may have resulted from the stress of the situation rather than intoxication. He did not think a failure to follow instructions meant that a person was intoxicated. In general, Brown said that nothing was wrong with Olsen's mental faculties. On redirect, Brown clarified that he did conclude that Olsen had lost the normal use of her physical and mental faculties. He stated that his prior contrary testimony resulted from him misunderstanding defense counsel's questions.

Before Brown arrested Olsen, Olsen gave him her cell phone so that Brown could speak to her grandmother (rather than one of her children's grandmothers). Olsen's grandmother testified at trial that during their conversation Brown told her that Olsen had passed the field sobriety tests. Brown could not recall whether he had told Olsen's grandmother that Olsen had passed the tests. More generally, Brown testified that the field sobriety tests are not "pass/fail" in nature and that their outcome depends on "clues" that he observes while he administers the tests.

Despite Brown's testimony that Olsen did not show any physical signs of intoxication, he also stated in his report that Olsen's eyes were red and watery. His report also noted that she swayed and was a little unsteady.

Based on his investigation, Brown arrested Olsen. He requested a blood draw. *See* TEX. TRANSP. CODE §§ 724.012(b)(2), 724.013 (peace officer shall require breath or blood sample when he arrests person for offense of driving while intoxicated with child passenger and person arrested for this offense cannot decline to provide sample). The laboratory results from the blood draw showed that Olsen had an alcohol concentration of 0.135.

### *Applicable Law*

#### *Driving While Intoxicated with a Child Passenger*

A person is guilty of driving while intoxicated with a child passenger if she operates a motor vehicle in a public place while intoxicated and a child who is less than 15 years old is in the vehicle. TEX. PENAL CODE § 49.045(a). A person is intoxicated if alcohol use has deprived her of the normal use of her physical or mental faculties or she has an alcohol concentration of 0.08 or more. *Id.* § 49.01(2).

#### *Probable Cause to Arrest*

A peace officer may arrest without a warrant a person who is found in a suspicious place and under circumstances that reasonably show that she has been guilty of a felony or a breach of the peace. TEX. CODE CRIM. PROC. art. 14.03(a)(1).

6

Driving while intoxicated with a child passenger is a state jail felony. TEX. PENAL CODE § 49.045(b). Driving while intoxicated also is a breach of the peace. *LeCourias v. State*, 341 S.W.3d 483, 489 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

There is probable cause for a warrantless arrest if the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information suffice to justify a reasonable belief that the person arrested committed the offense. *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009); *Perez v. State*, 464 S.W.3d 34, 40–41 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd). This standard requires a showing of more than a bare suspicion but less than is necessary to support a conviction. *Amador*, 275 S.W.3d at 878; *Perez*, 464 S.W.3d at 41. The standard is an objective one, unrelated to the subjective beliefs of the arresting officer, and requires consideration of the totality of the circumstances facing the officer. *Amador*, 275 S.W.3d at 878; *Perez*, 464 S.W.3d at 41. This means that an arresting officer's state of mind—except for the facts that he knows at the time of the arrest—is irrelevant to the existence of probable cause. *State v. Duran*, 396 S.W.3d 563, 570 n.17 (Tex. Crim. App. 2013). Thus, any facts the officer learns about after the arrest are irrelevant as to whether probable cause existed at the time of the arrest. *Torres v. State*, 868 S.W.2d 798, 801 (Tex. Crim. App. 1993).

*Jury Instruction as to Illegally Obtained Evidence*

If the evidence raises a fact issue as to whether evidence was illegally obtained, the trial court must instruct the jury to disregard this evidence if the jury believes, or has a reasonable doubt, that the evidence was illegally obtained. TEX. CODE CRIM. PROC. art. 38.23(a). A defendant is entitled to this instruction if she shows that the evidence raises an issue of fact; the evidence as to this fact is affirmatively disputed; and the dispute is material to the lawfulness of the challenged conduct. *Oursbourn v. State*, 259 S.W.3d 159, 177 (Tex. Crim. App. 2008). If these requisites are satisfied, the instruction is mandatory. *Robinson v. State*, 377 S.W.3d 712, 719 (Tex. Crim. App. 2012). Evidence creating a disputed issue of material fact may come from any source, and the jury instruction is required no matter whether the evidence creating the disputed issue of material fact is strong, weak, contradicted, unimpeached, or unbelievable. *Id.* A single witness may create a disputed issue of material fact by providing inconsistent testimony on direct and cross-examination. *Madden v. State*, 242 S.W.3d 504, 513–16 (Tex. Crim. App. 2007); *Totten v. State*, 570 S.W.3d 387, 390 (Tex. App.—Houston [1st Dist.] 2019, no pet.). For example, inconsistences in a peace officer's testimony as to the facts supporting probable cause may require an instruction as to whether evidence was illegally obtained. *See, e.g.*, *Mills v. State*, 296 S.W.3d 843, 846–49 (Tex. App.—Austin 2009, pet. ref'd) (officer's inconsistent testimony created fact issue requiring

instruction relating to reasonable suspicion to make traffic stop). When a disputed issue of material fact exists, it is the jury's prerogative to assess the credibility of the witnesses and weigh the evidence; neither the trial court nor this court may do so. *Hanks v. State*, 137 S.W.3d 668, 671–72 (Tex. Crim. App. 2004).

## *Analysis*

### *An Article 38.23 Instruction Was Required*

The majority concludes that Olsen was not entitled to an article 38.23 instruction as to the lawfulness of her arrest because she did not present evidence contradicting Brown's testimony that her performance on the field sobriety tests established probable cause or his testimony as to other circumstances that he relied on in deciding that he had probable cause. But Brown's testimony, standing alone, was so inconsistent on these subjects that it creates disputed issues of material fact as to the lawfulness of Olsen's arrest requiring a jury instruction under article 38.23.

Though Brown testified that Olsen showed signs of intoxication during all three tests, he also stated on cross-examination that her physical faculties were good or normal during the tests. Consider the following exchanges:

Q. You have to admit, her physical faculties were pretty darn good.

A. Correct.

\* \* \*

Q. And so—but you say that her physical faculties look normal if not better than normal?

9

A. I said, look normal.

Similarly, Brown indicated that Olsen retained the normal use of her mental faculties. During one exchange, he said there was nothing wrong with them:

Q. There's two components, physical and mental. You said her physical was good, it was fine. That only leaves mental. So what was wrong with her mental faculties based on the test?

A. Nothing was wrong with the mental faculties.

Ultimately, the lone deficiency he later testified to with respect to Olsen's mental faculties was her failure to follow his instructions. In his testimony, Brown identified a single failure to follow an instruction:

Q. That's what she did wrong when she didn't follow instructions. Instead of taking a series of small steps, she spun around, and you agree pretty well, to head back the other way?

A. Correct.

But he conceded that one might fail to follow instructions for reasons other than intoxication. As to Olsen, Brown agreed that her failure to follow his instruction may have resulted from the stress of the situation.

On redirect, Brown explained that his inconsistent testimony resulted from confusion; he said that he had misunderstood defense counsel's questions. But Brown's explanation of his inconsistent testimony does not erase these inconsistencies from the record for purposes of deciding whether there is a disputed issue of material fact that requires an article 38.23 instruction. *See Robinson*, 377

S.W.3d at 719 (evidence creates fact dispute regardless whether it is weak, contradicted, or unbelievable). Brown's explanation of his inconsistent testimony created a credibility issue, which was for the jury to resolve; neither the trial court nor this court may weigh the credibility of his explanation. *See Hanks*, 137 S.W.3d at 671–72. Article 38.23(a) required the jury to resolve the factual dispute created by Brown's inconsistent testimony as to whether Olsen's performance of the field sobriety tests showed that her physical or mental faculties were impaired.

The majority contends that there is not a disputed fact issue because "Olsen did not contest that she exhibited 'clues'" of intoxication on the standardized field tests. That's incorrect. During cross-examination, defense counsel elicited testimony from Brown that Olsen had the normal use of her physical and mental faculties during the field tests. The majority's holding thus rests on a purported distinction between evidence as to whether Olsen had the normal use of her faculties and evidence as to whether she showed signs of intoxication.

Brown's concession that he failed to observe any impairment of Olsen's physical or mental faculties, however, is evidence contradicting his testimony that she exhibited clues of intoxication. *See* TEX. PENAL CODE § 49.01(2) (defining "intoxicated" in relevant part as "not having the normal use of mental or physical faculties"). To say that Olsen appeared to have the normal use of her physical and mental faculties is to say that she did not appear to be intoxicated. *See id.* Brown

11

testified that when he used the term "intoxicated," he meant that "a person has lost his or her normal use of their mental and physical faculties." As Brown further testified, the purpose of the "field sobriety tests" is "to assist officers in detecting intoxicated drivers." The tests achieve this purpose by evaluating a motorist's physical and mental faculties. *See Gassaway v. State*, 957 S.W.2d 48, 51 (Tex. Crim. App. 1997); *Oguntope v. State*, 177 S.W.3d 435, 437 (Tex. App.—Houston [1st Dist.] 2005, no pet.).[1] Brown explained that when a person exhibits a certain number

---

[1] *See, e.g.*, *Ashby v. State*, 527 S.W.3d 356, 359 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) ("[B]ased on Ashby's slow, deliberate movements, his poor performance on the field sobriety tests, and his inability to follow instructions, Deputy Gossett determined that Ashby did not have his normal mental and physical faculties, and he placed Ashby under arrest for driving while intoxicated."); *Henry v. State*, 263 S.W.3d 151, 153 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("[Deputies] administered a field sobriety test to appellant and, after determining that appellant did not have control of his physical and mental faculties at the time of the accident, transported him to Ben Taub Hospital."); *Simon v. State*, 203 S.W.3d 581, 584–85 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ("Based upon their observations and appellant's poor performance on the field sobriety tests, Officers Tomeo and Nichols concluded that appellant had lost the normal use of his mental and physical faculties due to alcohol consumption, and arrested him for driving while intoxicated."); *Lorenz v. State*, 176 S.W.3d 492, 494 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) ("From appellant's performance on the field-sobriety tests, the deputy formed the opinion that appellant had lost the normal use of his mental and physical faculties, by reason of the introduction of alcohol into his body, and arrested appellant for DWI."); *Fulenwider v. State*, 176 S.W.3d 290, 294 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) ("Based on appellant's performance on the two field-sobriety tests, the HPD officer formed the opinion that appellant had lost the normal use of her mental and physical faculties by reason of the introduction of alcohol into her body."); *Hime v. State*, 998 S.W.2d 893, 895 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) ("After Girgenti administered field sobriety tests, on which appellant performed poorly, Girgenti concluded that appellant had

of predefined clues during a field sobriety test, this shows that "the subject is intoxicated and has lost the normal use of his or her mental and physical faculties." The majority's apparent distinction between Brown's testimony about Olsen's physical and mental faculties during the field sobriety tests on the one hand and his testimony about signs of intoxication she displayed during the tests on the other therefore has no basis in law or fact.

The majority concludes that this is not enough to create a fact dispute requiring an article 38.23 instruction. The majority maintains that Olsen instead had to introduce evidence directly disputing the particular clues of intoxication that Brown said Olsen exhibited during the field sobriety tests. The majority does not cite a single decision that stands for this proposition. Nor have I found a decision that does so. The majority's holding in this regard is contrary to the law, which recognizes that facts need not be proved by direct evidence and that circumstantial evidence and logical inferences that may be drawn from circumstantial evidence are equally probative. *See Hooper v. State*, 214 S.W.3d 9, 14–15 (Tex. Crim. App. 2007). Based on Brown's testimony that Olsen had the normal use of her faculties

---

lost the normal use of her mental and physical faculties as a result of the introduction of alcohol into her body."); *Emigh v. State*, 916 S.W.2d 71, 72 (Tex. App.—Houston [1st Dist.] 1996, no pet.) ("Officer Jones further testified that after appellant's performance of five field sobriety tests, he formed the opinion appellant did not have normal use of his mental and physical faculties and was intoxicated.").

during the field sobriety tests, a jury could reasonably infer that she did not exhibit sufficient clues of intoxication during these tests to warrant an arrest. A jury need not draw this inference, but it could reasonably do so based on the evidence. Article 38.23 commits the resolution of conflicts in the evidence like this one to the jury. *See* TEX. CODE CRIM. PROC. art. 38.23(a); *Robinson*, 377 S.W.3d at 719.

Similarly, Olsen's grandmother testified that Brown told her that Olsen had passed the field sobriety tests. A reasonable jury likewise could infer from the grandmother's testimony that Brown did not observe sufficient clues of intoxication to make an arrest. Thus, even if one disregards Brown's own inconsistent testimony and the inferences that a jury could reasonably draw from these inconsistences, Olsen did in fact offer affirmative evidence disputing the results of the field tests.

The majority further contends that Olsen did not contest other material facts—her direction of travel and the distance that she had traveled—that support probable cause for arrest. According to the majority, Olsen's failure to contest these other material facts defeats her entitlement to an article 38.23 instruction. *See Madden*, 242 S.W.3d at 510 (defendant is not entitled to instruction "if other facts, not in dispute, are sufficient to support the lawfulness of the challenged conduct").

But the majority's reliance on these other facts is fatally flawed. The existence of undisputed facts disentitles a defendant to an article 38.23 instruction if and only if these undisputed facts are sufficient to support the lawfulness of the challenged

14

conduct. *See id.* The majority does not contend that Olsen's direction of travel and the distance she traveled, standing alone, are sufficient to justify her arrest. Nor could the majority do so, as probable cause cannot be based solely on facts that are as consistent with innocent activity as criminal activity. *Torres*, 868 S.W.2d at 802–03. The majority argues that we must take these other facts into account in our analysis because the existence of probable cause depends on the totality of the circumstances. But the question before us on appeal is not whether probable cause existed. The question is whether there was a disputed fact issue material to whether Brown had probable cause to arrest Olsen for driving while intoxicated when he did so.

Once again, the majority ignores Brown's key testimony. Brown agreed while being questioned by defense counsel that he did not have any factual basis to think that Olsen had been drinking other than her performance on the field sobriety tests. Olsen's performance, he testified, was the sole fact supporting his decision to arrest her:

> Q. All right. And you understand that, well, not just in Texas, but in the United States, you have to have probable cause to arrest somebody for an offense?
>
> A. Correct.
>
> Q. And you would agree that probable cause is defined as specific and articulable facts that would cause a reasonable person to believe that an offense had been committed?
>
> A. Correct.

15

Q. And this particular situation it was DWI, by alcohol. You've already testified that drugs had absolutely nothing to do with the case, correct?

A. Correct.

Q. All right. And so you—when you arrested her for DWI by reason of introduction of alcohol into the body, you would agree that she hadn't admitted to consuming any alcohol, correct?

A. Correct.

Q. You hadn't smelled any alcohol, correct?

A. Correct.

Q. Officer Hart hadn't smelled any alcohol, correct?

A. Correct.

Q. So when you made that decision to arrest Ms. Olsen for DWI by alcohol, you had no reason to think that she had been drinking, other than the performance on the standardized field sobriety tests, correct?

A. Correct.

Because Brown conceded at one point that the lone factual basis he had for arresting Olsen was her performance on the sobriety tests, Olsen did not have to contest any facts other than whether those tests indicated that she'd lost the normal use of her physical or mental faculties in order to be entitled to an article 38.23 instruction. *See, e.g.*, *Middleton v. State*, 125 S.W.3d 450, 454 (Tex. Crim. App. 2003) (instruction given by trial court where officer did not rely on multitude of factors to come to his conclusion as to probable cause and sole basis was subject to factual dispute).

In a footnote, the majority suggests that Brown's inconsistencies, including his concession that he had no reason to think Olsen was drunk other than her performance on the field sobriety tests, are of no moment because the standard for determining probable cause is an objective, rather than a subjective, one. This suggestion, however, lays bare the majority's error. I do not disagree that it is the objective facts in existence at the time of the arrest and not the subjective conclusions that Brown drew from these facts that we must scrutinize to determine the existence of probable cause. The problem is that we don't know what objective facts were in existence because Brown repeatedly contradicted himself. His inconsistencies as to the facts are the reason that an article 38.23 instruction was required. When there are factual disputes of this nature, a jury—not the trial court nor this court—must resolve them, which it can do only if it receives the required instruction raising the issue for it to decide. *See* TEX. CODE CRIM. PROC. art. 38.23(a); *Robinson*, 377 S.W.3d at 719. Without acknowledging that it has done so, the majority has erroneously acted as factfinder and credited the version of the facts most favorable to the prosecution.

The majority justifies its approach to this case by reasoning that Brown's testimony that Olsen exhibited the normal use of her faculties during the sobriety tests does not conflict with his testimony that she displayed clues of intoxication during these tests because the former is merely Brown's subjective perception whereas the latter are objective facts. But the clues of intoxication that Brown said

17

he saw are no less dependent on his subjective perception than his factual observations about Olsen's physical and mental faculties. The majority's argument to the contrary conceives of a peace officer's testimony about clues of intoxication observed during a field sobriety test as a special category of objective evidence distinct from all other testimonial evidence bearing on intoxication, such as stumbling or slurred speech. This is at odds with Texas law, which recognizes that proof of intoxication by means of an officer's testimony about field sobriety tests is subjective in that it turns on the officer's subjective perception of the defendant's performance. *See Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012) (DWI statute defines intoxication in two ways, one of which is "subjective definition" of not having normal use of one's faculties); *Bagheri v. State*, 119 S.W.3d 755, 764 (Tex. Crim. App. 2003) (agreeing that officer's testimony about defendant's apparent intoxication and poor performance on sobriety tests was "somewhat subjective"); *Veliz v. State*, 474 S.W.3d 354, 367 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (taking into account "subjective nature of field sobriety tests" in assessing whether error affected defendant's substantial rights); *Hartman v. State*, 144 S.W.3d 568, 574 (Tex. App.—Austin 2004, no pet.) (officer did not act unreasonably in detaining defendant longer to obtain video camera "to add a degree of certainty to the otherwise highly subjective field sobriety tests performed").

In sum, Brown testified that his decision to arrest Olsen was based on her performance on the field sobriety tests and Brown's own inconsistent testimony about Olsen's performance on the field sobriety tests and whether she had the normal use of her physical and mental faculties suffices to create a genuine issue of material fact requiring the article 38.23 instruction. *See id.* at 513–16 (contradictions in single witness's testimony can create disputed fact issue); *Totten*, 570 S.W.3d at 390 (same); *see e.g.*, *Mills*, 296 S.W.3d at 846–49 (officer's inconsistent testimony as to whether he could see if defendant had signaled turn required instruction relating to whether ensuing traffic stop was unlawful).

### *The Trial Court's Error Was Not Harmless*

A trial court's erroneous failure to include an article 38.23 instruction in the jury charge is reversible if it causes some harm. *Atkinson v. State*, 923 S.W.2d 21, 27 (Tex. Crim. App. 1996), *abrogated on other grounds by Motilla v. State*, 78 S.W.3d 352 (Tex. Crim. App. 2002). Under this standard, when the error was properly preserved for review, we must reverse unless the error was harmless. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). In deciding whether there was some harm, we consider the entire jury charge, the state

of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information in the record. *Id.*[2]

Intoxication is an essential element of the offense. TEX. PENAL CODE § 49.045(a). In accord with the statutory definition of that term, the state may prove intoxication by several means: by proof that the person was deprived of the normal use of her physical faculties, the person was deprived of the normal use of her mental faculties, or the person had an alcohol concentration of 0.08 or more. *Id.* § 49.01(2); *Bagheri*, 119 S.W.3d at 762. The charge defined the term in accord with its statutory definition and asked the jury to answer a single broad-form question as to Olsen's guilt or innocence without differentiating between the three alternative means of proving intoxication.

The evidence at trial as to Olsen's physical and mental faculties was hotly contested. The testimony of Officer Brown, the key witness on this subject, was inconsistent in many respects, including as to whether the field sobriety tests showed that Olsen had lost the normal use of her faculties. The laboratory results of Olsen's blood draw—the evidence she contends the jury should have been instructed to disregard if it found it was illegally obtained—thus assumed special significance.

---

[2] The Court of Criminal Appeals has more recently reaffirmed that this is the correct harm standard to apply under these circumstances. *See Vogel v. State*, No. PD-0873-13, 2014 WL 5394605, at *4 (Tex. Crim. App. Sept. 17, 2014).

The state's closing argument underscores the special significance that Olsen's blood draw assumed at trial. Early in its closing, the state emphasized that the jury need not agree as to the particular proof of Olsen's intoxication. It argued:

> I want to remind you, you don't have to agree on the method, remember? You four can agree that she lost the normal use of her physical faculties. You four can believe that it was her mental faculties, and you four can believe the number, or any way you want to.

The state further argued that the blood draw proved that Officer Brown was correct in his assessment that Olsen was deprived of the normal use of her physical or mental faculties: "And it's all confirmed. Everything that the officer did that day, every decision point was met was all confirmed by State's Exhibit 13, that she is a .135." State's Exhibit 13 was the laboratory report documenting Olsen's alcohol concentration. Later in its closing, the state returned to this argument: "She lost the normal use of her mental or her physical faculties due to the introduction of alcohol, and that was later confirmed by the blood test." The state characterized the blood draw as the critical proof of guilt, describing it as "the one thing" that Olsen "really can't shy away from."

If the trial court had included the article 38.23 instruction in the charge as Olsen requested, the jury would have had the opportunity to decide whether the critical evidence of her guilt was illegally obtained. Had the jury decided this disputed fact issue in Olsen's favor, a possibility on this record, its verdict then would have turned on the contested and inconsistent evidence as to whether Olsen

21

was deprived of the normal use of her physical or mental faculties. The trial court's error thus significantly skewed the jury's deliberations by leaving it no choice but to consider the blood draw's laboratory results in deciding whether Olsen was guilty.

These laboratory results doubtless had a significant impact on the jury's verdict. The state introduced these results through expert testimony from Nirav Kumar, a forensic scientist employed by the Texas Department of Public Safety. Kumar testified that Olsen's 0.135 blood alcohol concentration was higher than the legal limit. He estimated that her blood alcohol concentration indicated that she had fully absorbed "three to four standard drinks" by the time that her blood was drawn. As the Court of Criminal Appeals has observed, scientific evidence of a defendant's alcohol concentration exercises a "powerful persuasive effect" on juries. *Bagheri*, 119 S.W.3d at 764. It therefore would be fanciful to suggest that this scientific evidence did not sway the jury in a case like this one, in which the state argued both that the laboratory results were the key evidence of Olsen's guilt that she could not refute and that this evidence proved the veracity of the arresting officer's testimony. *See id.* (harm analysis of erroneous admission of expert testimony about alcohol concentration must take into account whether it might have prejudiced jury's consideration of other evidence or substantially affected jury's deliberations).

Considering the jury charge, state of the evidence, and the state's closing argument, the omission of the article 38.23 instruction requested by Olsen caused

22

her some harm. *See McGuire v. State*, 493 S.W.3d 177, 198–99 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (admission of illegally obtained blood draw lab result not harmless where there was conflicting evidence as to whether defendant appeared to be intoxicated). Thus, the trial court's judgment should be reversed.

### *Conclusion*

The trial court erred by refusing Olsen's requested article 38.23 instruction in the jury charge, and its error was not harmless. The appropriate remedy under these circumstances is reversal and remand for a new trial. *Reece v. State*, 878 S.W.2d 320, 322–24, 327 (Tex. App.—Houston [1st Dist.] 1994, no pet.). Because the majority does not grant Olsen a new trial, I respectfully dissent.

Gordon Goodman
Justice

Panel consists of Justices Lloyd, Goodman, and Landau.

Justice Goodman, dissenting.

Publish. Tex. R. App. P. 47.2(b).